Waldemar J. Coliz and Martha W. Coliz v. Commissioner. John Pezzullo and Betty Pezzullo v. Commissioner
Coliz v. Commissioner
Docket Nos. 94790, 94791.
United States Tax Court
T.C. Memo 1963-339; 1963 Tax Ct. Memo LEXIS 7; 22 T.C.M. (CCH) 1775; T.C.M. (RIA) 63339; December 27, 1963
Ethan B. Stroud, 2808 Southland Center, Dallas, Tex., and Jack W. Hawkins, for the petitioners. Harold D. Rogers, for the respondent. DAWSON
Memorandum Finding of Fact and Opinion DAWSON, Judge: Respondent determined the following deficiencies in the income tax of petitioners for the year 1958: Docket No.
Petitioners
Deficiency
94790
Waldemar J. & Martha W.
Coliz
$83,996.28
94791
John & Betty Pezzullo
88,757.93 Pursuant to joint motion, both cases were consolidated for trial. [1]
The sole issue for decision is whether the sum of $174,000 received by each of the petitioners [2] during the taxable year 1958 represents the proceeds from the sale of a capital asset or a distribution of earnings and profits from a corporation taxable to them as ordinary income. *9 Findings of Fact Some of the facts were stipulated by the parties. Their stipulation, together with attached exhibits, is incorporated herein by this reference. Waldemar J. Coliz (hereinafter sometimes referred to as Coliz) and Martha W. Coliz are husband and wife residing in Dallas, Texas. Their joint return for the year 1958, made on the cash basis and for the calendar year period, was filed with the district director of internal revenue, Dallas, Texas. John Pezzullo (hereinafter sometimes referred to as Pezzullo) and Betty Pezzullo are also husband and wife and reside in Dallas, Texas. For the calendar year 1958 their joint return, made on the cash basis, was filed with the district director at Dallas. In 1952 petitioners organized a Texas corporation under the name of Gulf Industries, Inc., and by 1958 each owned 50 percent of its stock. Gulf Industries, Inc., hereinafter referred to as Gulf-Texas, was engaged generally in the business of subcontracting machine parts for the major aircraft and instrument manufacturers in the Dallas-Fort Worth area. Among its customers were the Convair Division of General Dynamics Corporation, Bell Aircraft Company, Chance Vought Corporation, *10 Temco, Inc., Texas Instruments, Inc., and others. Petitioner Coliz was responsible primarily for making sales contracts for Gulf-Texas, working up cost estimates and the submission of quotations and bids on various jobs, while petitioner Pezzullo's duties consisted mainly of managing the machine shop and overseeing the work of its employees. Subsequent to 1952 Gulf-Texas both grew and realized substantial net earnings. As a result, between 1952 and 1957 Coliz and Pezzullo received numerous offers from various individuals and corporations, ranging in size from $900,000 to $1,800,000, for their stock in the company. Although the majority of these offers could have ripened into contracts of sale had petitioners accepted their terms (one of which in each case was that Coliz and Pezzullo remain with Gulf-Texas after the sale) petitioners rejected all of them because of their belief that the company had a greater value at the time than what was being offered. At the beginning of 1958 Gulf-Texas had a fair market value of approximately $1,500,000. In January of that year, C. P. Waggoner, a businessman residing in Grand Prairie, Texas, contacted Coliz and offered to purchase all of the *11 outstanding stock of Gulf-Texas for $850,000. This offer was declined. Thereafter, petitioners again met with Waggover, in the company of two other businessmen of Grand Prairie, Sam Lee and Gene Goree, for the purpose of discussing the sale of all of the outstanding stock of Gulf-Texas. Petitioners advised Waggoner, Goree, and Lee that they would be willing to sell such stock for $1,250,000. Goree and Lee then suggested that L. D. Roberts, an oil broker living in Houston, be brought into the negotiations because of his experience in such matters and because Roberts had once arranged for the sale of a company owned by Lee and Goree. Roberts, Goree, Lee, and Waggoner (hereinafter referred to as the Roberts Group) thereafter offered to purchase the assets of Gulf-Texas, but petitioners were unwilling to dispose of the company in this manner and insisted upon a sale of stock. Several meetings were held during May 1958 between petitioners and the Roberts Group and preliminary negotitions developed into negotiations involving drafts of proposed written contracts. Petitioners were assisted in these negotiations by their certified public accountant, Clayton Tuggle, and by their attorney, *12 Wallace Savage, while the Roberts Group retained David Witts, an attorney, to represent them. Although neither of petitioners was related to any member of the Roberts Group (including Witts) and knew none of them other than casually, both petitioners were aware that each member of the Roberts Group was possessed of substantial means. On May 27, 1958, the Roberts Group, including David Witts, caused to be formed under the laws of the State of Delaware, Gulf Industries, Inc., a Delaware corporation hereinafter referred to as Gulf-Delaware 1. Gulf-Delaware 1 was incorporated with a paid-in capital of $1,000 and its stock was owned as follows: Stockholder
Shares
Cost
C. P. Waggoner
215
$ 215.00
Gene Goree
215
215.00
Sam Lee
215
215.00
L. D. Roberts
205
205.00
David Witts
150
150.00
Total
$1,000.00 On the date of its incorporation petitioner Coliz became president of Gulf-Delaware 1 and petitioner Pezzullo vice president. Although neither received any stock in Gulf-Delaware 1, both petitioners were made directors of the corporation. Negotiations for the sale of petitioners' stock in Gulf-Texas continued with the Roberts Group into July of 1958. *13 Various drafts of a proposed contract of sale were submitted by each side. Finally, on July 23, 1958, these protracted negotiations resulted in the execution of several contracts, among which was an agreement, between Coliz and Pezzullo, as sellers, and Waggoner, Goree, Lee, Roberts, and Gulf-Delaware 1 as buyers, providing for the sale of the stock of the sellers in Gulf-Texas to the buyers. This agreement, hereinafter referred to as the Original Stock Purchase Agreement, provided in pertinent part as follows: THIS CONTRACT and agreement, made this 23 day of July, 1958, between John Pezzullo and W. J. Coliz, hereinafter referred to as Sellers and C. P. Waggoner, Eugene W. Goree, Sam W. Lee, L. D. Roberts and, being stockholders, and acting for and in behalf of a corporation organized under the laws of the State of Delaware, and known as Gulf Industries, Inc., hereinafter referred to as Buyers, and all of whose capital stock will be issued and delivered to said Waggoner, Goree, Lee, Roberts and Witts, WITNESSETH: WHEREAS, Sellers are the owners and holders of all of the issued and outstanding shares of the capital stock of Gulf Industries, Inc., a Texas corporation, and WHEREAS, *14 Sellers are willing to sell and dispose of all their capital stock in the aforesaid corporation, and WHEREAS, Buyer has agreed to purchase the aforesaid Capital stock of the aforesaid corporation from Sellers upon the terms and conditions hereinafter set forth, NOW, THEREFORE, for and in consideration of the mutual promises and covenants herein contained, the parties hereto agree as follows: 1. Consideration: Subject to the terms and conditions herein set forth, Sellers shall sell to Buyer, and Buyer shall purchase from Sellers, all of the shares for an aggregate purchase price of $1,200,000.00 (hereinafter called the "Price") payable as follows: (a) $348,000 upon closing. (b) Until the balance of the purchase price ($852,000.00) shall have been made in full, payment shall be made as follows: (i) On the 15th day after the Certified Public Accountants then retained by the corporation shall have rendered their audit report with respect to the period from date of closing to December 31, 1958, an amount equal to 95% of Gulf Industries, Inc.'s of Delaware net income after computation for income taxes, whether or not such income taxes are payable, plus $25,000.00 or the amount *15 paid for rental of machinery and equipment, whichever is the greater amount. (ii) On the 15th day after the Certified Public Accountants then retained by the corporation shall have rendered their audit report with respect to the period commencing January 1, through December 31, 1959, 1960, 1961 and 1962 an amount equal to 95% of Gulf Industries, Inc.'s of Delaware net income after computation of income taxes, whether or not such income taxes are payable, plus $50,000.00 or the amount paid for rental of machinery and equipment, whichever is the greater amount. For the period January 1, 1963 through December 31, 1963 an amount equal to 95% of Gulf Industries, Inc.'s of Delaware net income after computation for income taxes, whether or not such income taxes are payable, plus $25,000.00 or the amount paid for rental of machinery and equipment, whichever is the greater amount. Thereafter, an amount equal to 95% of Gulf Industries, Inc.'s of Delaware net income after computation for income taxes, whether [or] not such income taxes are payable, until the total purchase price shall have been paid in full. (iii) Any responsibility for re-negotiation from the date of closing shall *16 be the responsibility of the Buyer and any payments to be made to Sellers as provided above on the purchase price shall not be reduced by reason of any re-negotiation of defense contracts to be performed by the Corporation or by any other Corporation or Corporations that may be treated as a unit for purposes of re-negotiation. (iv) No reduction in the payments on the purchase price is to be made by reason of interest on any loans made by Buyer other than on such loans as may be required for working capital. (v) No reduction in the payments on the purchase price is to be made by reason of any payments to Chance Vought Aircraft, Incorporated on the $228,300.00 owing to Chance Vought by Gulf Industries, Inc. (a Texas corporation) in accordance with letter agreement dated July 23, 1958, a copy of which is hereto attached and marked Exhibit "B". [3]
*17 The above agreement was signed by Coliz and Pezzullo as sellers and Waggoner, Goree, Lee, and Roberts as "Buyers." Also on July 23, 1958, Coliz and Pezzullo and Waggoner, Goree, Lee, Roberts, and Gulf-Delaware 1 executed a supplemental agreement (hereinafter sometimes referred to as the First Supplemental Agreement) the fourth numbered paragraph of which provided the following: 4. In the event that Gulf Industries, Inc. (a Delaware corporation) is unable to make payments to Sellers on its contractual installments as provided in the agreement dated July 23, 1958, for any or all of the following reasons: a. Because of rental payments made on any sale and lease back of any machinery and equipment, or b. Because of payments of Chance Vought Aircraft, Incorporated, on the obligation of $228,300.00 due to Chance Vought, which has been assumed by Gulf Industries, Inc. (a Delaware corporation) referred to in paragraph 1 (v) of said agreement dated July 23, 1958 and because of making payments on any or all of the above, Gulf Industries, Inc. (a Delaware corporation) is lacking in sufficient funds to make its payments to sellers on the deferred balance due sellers in the amount of *18 $852,000.00, as set out in said agreement dated July 23, 1958, C. P. Waggoner, Sam W. Lee, L. D. Roberts and Eugene W. Goree, jointly and severally, agree to make financial arrangements for or advances to Gulf Industries, Inc. (a Delaware corporation) to enable it to make payments due sellers thereunder when same shall become due and payable. The above agreement was signed by Pezzullo, Coliz, Waggoner, Goree,lee, and Roberts in their individual capacities and by Waggoner as vice president on behalf of Gulf-Delaware 1. In addition to the Original Stock Purchase Agreement and the First Supplemental Agreement Coliz and Pezzullo, at the behest of the Roberts Group, also entered into, on July 23, 1958, an employment contract (hereinafter referred to as the Employment Agreement) with Gulf-Delaware 1. [4] The Employment Agreement provided that the term of employment would be until such time as the payments owing by Gulf-Delaware 1 to Coliz and Pezzullo had been completely discharged, and that, during the period of employment covered by the Agreement Coliz and Pezzullo would have complete authority to conduct the business affairs of the corporation and for which they would assume full responsibility. *19 The Agreement provided that Coliz and Pezzullo would receive salaries of $30,000 each for the year beginning July 1, 1958, and ending June 30, 1959, and salaries for each year thereafter of $25,000 each. It was further provided that in the event the payments of $852,000 due Coliz and Pezzullo by the corporation were completely paid and discharged before the end of any 1 year period, the Employment Agreement would be terminated at the time the payment was made and the corporation would pay them their salaries only down to the end of the month in which such final payment was made. The closing of the sale of the capital stock of Coliz and Pezzullo in Gulf-Texas to the Roberts Group had been scheduled to take place on August 8, 1958, at the First National Bank in Dallas. However, Coliz and Pezzullo failed to appear at this scheduled closing, whereupon David Witts, attorney for the Roberts Group, sent them a letter threatening to sue for specific performance of the contractual obligation set forth *20 in the Original Stock Purchase Agreement and, further, threatening to hold them responsible for all damages occasioned by their failure to perform, including all costs incurred in connection with negotiations and in connection with all litigation that might be required to obtain full restitution for all persons and corporations damaged by their failure to perform. After receiving the Witts' letter, Coliz and Pezzullo determined to consummate the transaction, and, on August 14, 1958, they transferred their stock in Gulf-Texas to Gulf-Delaware 1. On that same day Gulf-Delaware 1 and Gulf-Texas executed an Agreement of Merger and thereafter Gulf-Texas was merged into Gulf-Delaware 1 pursuant to said Agreement of Merger and the corporate laws of the States of Delaware and Texas. Also on August 14, 1958, Waggoner, Goree, Lee, Roberts, and Witts, as pledgors, entered into a collateral pledge of stock agreement (hereinafter referred to as the First Collateral Pledge Agreement), the first four paragraphs of which provided as follows: THIS AGREEMENT made this 14th day of August, 1958, between C. P. Waggoner, Eugene W. Goree. Sam W. Lee and L. D. Roberts and David A. Witts, as Pledgors, and *21 W. J. Coliz and John Pezzullo, as Pledgees: WITNESSETH: 1. Pledge: Pledgors, for and in consideration of Ten and no/100 ($10.00) Dollars, and other good and valuable considerations, hereby assign to Pledgees, stock certificates Numbers 1, 2, 3, 4, and 5 representing 1,000 shares of the capital stock of Gulf Industries, Inc., a Delaware corporation, herewith delivered to the Pledgees. Pledgees shall hold the pledged stock in accordance with certain contracts between said Gulf Industries, Inc. and the first four named Pledgors and Pledgees dated July 23, 1958 and Aug. 14, 1958. 2. Rights and Benefits: During the term of this pledge and so long as Pledgors and/or Gulf Industries, Inc., a Delaware corporation, is not in default in the performance of any of the terms of the contracts of July 23, 1958, & 8-14-58 Pledgors shall be entitled to all dividends, voting rights, and any and all rights, benefits or privileges accruing to this stock. 3. Default: In the event of default in the performance of either contract, Pledgees may, after having given Pledgors thirty (30) days written notice of such default, sell such stock at public or private sale. 4. Return of Stock: Upon satisfactory *22 performance of the contracts, Pledgees agree to immediately return such stock to Pledgors. In the early stages of the negotiations which led to the July 23, 1958, agreements and the August 14, 1958, stock transfer, the parties had tentatively agreed that the Roberts Group would furnish Gulf-Delaware 1 some $200,000 in cash from their personal funds to be used by that corporation in its acquisition from Coliz and Pezzullo of their Gulf-Texas stock. Subsequently, the Roberts Group proposed instead that the money be borrowed by them, to which proposal Coliz and Pezzullo agreed. Later, the Roberts Group suggested the money be borrowed by Gulf-Delaware 1 from a bank, with them as individual guarantors of the note. Again Coliz and Pezzullo agreed. Thereafter, the Roberts Group suggested a third plan for raising the necessary funds by having some of the assets of Gulf-Texas sold with an option to lease back. To this plan Coliz and Pezzullo objected. Finally, on July 23, 1958, the parties agreed that the necessary money would be raised by means of a sale and lease back, with the understanding that the Roberts Group would personally guarantee the contract with the buyer and lessor of the *23 equipment. The First Supplemental Agreement of July 23, 1958, therefore provided that in raising the $348,000 down payment to be made to Coliz and Pezzullo, the sellers, by the Roberts Group and Gulf-Delaware 1 as buyers: 2. Sellers agree that buyers will be permitted to use $148,000.00 of the cash in Gulf Industries, Inc. of Texas, and to sell for $200,000.00 and lease back certain of the assets of Gulf Industries, Inc. to provide the cash for the initial $348,000.00 payment due upon closing * * * [of the Original Stock Purchase Agreement]. On August 14, 1958, Coliz and Pezzullo, as sellers, and Waggoner, Goree, Lee, Roberts, and Gulf-Delaware 1, as buyers, executed another supplemental contract of sale, hereinafter referred to as the Second Supplemental Agreement. This agreement recited that the parties had heretofore entered into a contract for the sale of the capital stock of Gulf-Texas but that "for various reasons said contract for the sale of such stock was not closed on July 31, 1958." Except as modified therein, the Second Supplemental Agreement provided that the Original Stock Purchase Agreement and the First Supplemental Agreement would remain in full force and effect. *24 Paragraph 5 of the Second Supplemental Agreement provided in part that: It is understood by all parties to this agreement that the initial payment of Three Hundred Forty-Eight Thousand Dollars ($348,000.00) is to be provided by the sale for Two Hundred Thousand Dollars ($200,000.00) of certain assets now belonging to Gulf Industries, Inc. of Texas and to be transferred to Gulf Industries, Inc. of Delaware by said merger and, further, by the collection of accounts receivable in an amount now in excess of One Hundred Forty-Eight Thousand Dollars ($148,000.00) due from Chance Vought Aircraft, Inc., which accounts receivable have not been paid pending the final conclusion of negotiations and/or contracts between Sellers and Buyers. Mr. L. D. Roberts, who has been designated by Buyers as their attorney in fact to transact all business and dealings with Sellers in connection with said sale of stock, has personally satisfied himself for himself and Buyers that said funds in said amount of Three Hundred Forty-Eight Thousand Dollars ($348,000.00) are available from the sources indicated for the initial payment of Three Hundred Forty-Eight Thousand Dollars ($348,000.00) due Sellers. In *25 connection with the plan of the Roberts Group to sell and lease back certain of the assets of Gulf-Texas, either David Witts or L. D. Roberts contacted Jack C. Vaughn, president of Television Properties, Inc., a Texas corporation, as a prospective purchaser. During the negotiations which ensued Vaughn dealt primarily with Witts and Roberts, although he understood that any lease made by Television Properties, Inc., would be personally guaranteed by Goree, Lee, Waggoner, and Roberts, each of whom he knew to have a substantial net worth. The First National Bank in Dallas subsequently arranged to loan Television Properties, Inc., the funds with which to purchase the assets from Gulf-Delaware 1, and in connection with this loan Goree, Lee, and Waggoner, as prospective guarantors of the lease payments to Television Properties, Inc., submitted their financial statements to the bank. On August 21, 1958, Gulf-Delaware 1 sold four Kearney and Trecker Universal Milling Machines to Television Properties, Inc., for the sum of $200,000. On this same date, Television Properties, Inc., leased back these four machines to Gulf-Delaware 1. Also, on August 21, 1958, Waggoner, Goree, Lee, and Roberts *26 executed a Guaranty Agreement wherein they jointly and severally unconditionally guaranteed and promised, upon demand, to pay Television Properties, Inc., all rents, and other sums due, under the lease executed August 21, 1958, between Television Properties, Inc., and Gulf-Delaware 1, in the amounts, at the times and in the manner set forth in the lease, and they further agreed to guarantee the performance, at the times and in the manner set forth in the lease, of all of the terms, covenants, and conditions therein required to be kept, observed, or performed by Gulf-Delaware 1, as lessee. The Guaranty Agreement specifically recited that the obligations of the signatories thereto were joint and several, and were independent of the obligations of Gulf-Delaware 1 as lessee. On August 21, 1958, Coliz and Pezzullo each received a check in the amount of $174,000 from Gulf-Delaware 1 in part payment for the Gulf-Texas stock which they had transferred to Gulf-Delaware 1 on August 14, 1958. These two checks, aggregating $348,000 and representing a down payment to Coliz and Pezzullo pursuant to the terms of the Original Stock Purchase Agreement of July 23, 1958, were drawn against the account *27 of Gulf-Delaware 1 at the First National Bank in Dallas. The checks were signed for Gulf-Delaware 1 by John Pezzullo and David A. Witts. The major portion of the deposit of Gulf-Delaware 1 against which the checks were drawn was composed of $200,000 received by Gulf-Delaware 1 as proceeds from the August 21, 1958, sale to Television Properties of the four Kearney and Trecker milling machines and $158,000 from funds originally belonging to Gulf-Texas and used for this purpose by Gulf-Delaware 1 pursuant to the First Supplemental Agreement of July 23, 1958. As of August 21, 1958, both Coliz and Pezzullo fully expected to receive the $852,000 balance of the sales price on their Gulf-Texas stock. The prospects for the continued growth of Gulf-Delaware 1 at this time were bright. Shortly after the merger of August 14, 1958, Gulf-Delaware 1 had been awarded a sizeable contract with Temco, Inc., due primarily to the efforts of Waggoner. Moreover, Gulf-Delaware 1 began doing business again with certain other aircraft manufacturers with which it had not done business for sometime, again due to the efforts of Waggoner. Sometime in November of 1958 Trevor Gardner, president of Hycon Manufacturing *28 Company, conferred in Dallas, Texas, with L. D. Roberts concerning the possible merger of Gulf-Delaware 1 with Hycon Aerial Surveys, Inc., a Delaware corporation (hereinafter referred to as Aerial) which was the wholly owned subsidiary of Hycon Manufacturing Company. In the ensuing negotiations with Gardner, Waggoner, Goree, Lee and Roberts, owners of the stock of Gulf-Delaware 1, were represented by David Witts. Neither Coliz nor Pezzullo were directly involved in these negotiations, which ultimately led to the merger of Aerial and Gulf-Delaware 1. On January 27, 1959, Aerial and Gulf-Delaware 1, together with a majority of the directors of both corporations, executed an Agreement of Merger pursuant to which the two corporations were merged. On or about this same date the name of Aerial was changed to Gulf Industries, Inc., and these merged companies are hereinafter referred to as Gulf-Delaware 2. Immediately after the merger, the common stock of Gulf-Delaware 2 was held as follows: Stockholder
No. of Shares
C. P. Waggoner
43
David Witts
30
Gene Goree
43
Sam Lee
43
L. D. Roberts
41
Hycon Mfg. Co.
800
Total
1,000 In addition to the 800 shares of common *29 stock, Hycon Manufacturing Company also owned all of the preferred stock of Gulf-Delaware 2 in the amount of 4,000 shares. In order for the foregoing merger to have taken place, it was necessary for the shareholders of Gulf-Delaware 1 (Waggoner, Goree, Lee, Roberts, and Witts) to secure from Coliz and Pezzullo a release of their stock which had been held in escrow under the First Collateral Pledge Agreement of August 14, 1958. This they were able to do, but only after overcoming considerable reluctance on the part of Coliz and Pezzullo. Thereafter, Waggoner, Goree, Lee, Roberts, Witts, and Hycon Manufacturing Company, as pledgors, entered into a second stock pledge agreement, hereinafter referred to as the Second Collateral Pledge Agreement, with Coliz and Pezzullo as pledgees, and the First National Bank in Dallas as escrow agent whereby the pledgors assigned to the pledgees stock certificates representing 100 percent of the outstanding stock of Gulf-Delaware 2, being 1,000 shares of $1 par value common stock and 4,000 shares without par value of the $5 cumulative non-participating preferred stock of said corporation. These stock certificates were delivered to the pledgees, to *30 be held by them in accordance with the terms of the Original Stock Purchase Agreement, the First Supplemental Agreement, the Second Supplemental Agreement, the Employment Agreement, the First Collateral Pledge Agreement, and the Agreement of Merger of January 27, 1959. The Second Collateral Pledge Agreement provided that so long as the pledgors under the agreement were not in default under any of the above agreements, the pledgors would be entitled to all dividends, voting rights, and any and all rights, benefits, or privileges accruing to the pledged stock. The Second Collateral Pledge Agreement further provided that: In the event of default in the performance of any of the terms of any of said contract, Pledgees may, after having given thirty (30) days written notice of such default to Pledgors and after Pledgors having failed to correct such default within said thirty (30) days, sell such stock at public or private sale; provided that no sale shall be made until Pledgors have been given at least ten (10) days written notice of such sale and further provided that Pledgors shall have the right to bid on equal terms with others at such sale. During the early part of 1959 the sales *31 and net earnings of Gulf-Delaware 2 began to decrease due primarily to the unforeseen decline in the aircraft industry in general and in particular to the failure of Chance Vought Aircraft, one of the major customers of Gulf-Delaware 2, to obtain a contract which had been let in December 1958 for a new military fighter plane. Sometime prior to April 24, 1959, Goree, Lee, and Waggoner assigned all of their stock in Gulf-Delaware 2 to Roberts. Goree and Lee received no consideration for this assignment other than an agreement by Roberts to indemnify them against further liability under the various agreements, including liability upon the guaranty of the lease payments to Television Properties, Inc. Waggoner received, however, in addition to the indemnification agreement, $5,000 in cash and a $5,000 note from Roberts. On April 24, 1959, Coliz and Pezzullo sent Roberts a letter the first portion of which quoted paragraph 4 of the First Supplemental Agreement (set forth in these Findings, supra). The third paragraph of this letter stated: For and in consideration of your having purchased all of the stock of Gulf Industries, Inc., being 129 number of shares, owned by Eugene W. Goree, *32 Sam W. Lee and C. P. Waggoner, we, for ourselves and only for ourselves and conditioned upon the consent of all the other parties to said contract, hereby amend the contract of July 23, 1958, to the extent that C. P. Waggoner, Eugene W. Goree and Sam W. Lee are released and relieved of any and all liability under Paragraph 4 as hereinabove set out. Insofar as L. D. Roberts is concerned Paragraph 4 shall remain in full force and effect. It is specifically understood and agreed that this release is on behalf of ourselves only and nothing herein contained shall be construed to alter, modify, reduce, jeopardize or otherwise affect any legal rights or other interest that Hycon Manufacturing Company, a Delaware corporation, Hycon Aerials Surveys, Inc., (now named Gulf Industries, Inc.) a Delaware corporation, L. D. Roberts, David A. Witts, or any other party to the agreement dated December 31, 1958, relating to the merger of Gulf Industries, Inc., and Hycon Aerial Surveys, Inc. may have. This personal release from us shall not affect any of the rights of said other parties to take action, legal or otherwise, for themselves nor shall this release be construed to prevent John Pezzullo and/or *33 W. J. Coliz from taking any such action, legal or otherwise, in the name of John Pezzullo and W. J. Coliz, or either of them, as they may be obligated to take in order to carry out and fully perform all obligations arising by reason of said contract for the merger of Gulf and Aerial Surveys on behalf of or in the interest of any of the other said parties thereto. Coliz and Pezzullo neither received any consideration from Waggoner, Goree, or Lee for writing the April 24, 1959, letter to Roberts, nor did they believe that the letter released these three men from their obligations under the Original Stock Purchase Agreement. [5]
*34 Although in January of 1959 Gulf-Delaware 1 had made the first installment payment of $36,860 to them under the Original Stock Purchase Agreement, by October 3, 1959, Coliz and Pezzullo, after consulting with their attorney, were prompted to send the following letter addressed to Hycon Manufacturing Company, Roberts, Waggoner, Goree, Lee, and Witts: The contents of this letter are brought to your attention in your respective capacities, individually and as shareholders of Gulf Industries, Inc., and will serve to confirm in writing verbal information which you have had for some time. The present financial condition of Gulf is such that it cannot continue to comply with its obligations under the Equipment Lease dated August 14, 1958, and under the Employment Agreement, dated July 23, 1958, and also discharge its current trade obligations and pay its operating expenses, and it shall become necessary rather quickly that additional funds be made available to it for operating expenses. In addition, the First National Bank has declined to renew a $25,000 note which fell due September 30th, of which Mr. Roberts is already aware. Moreover, Gulf's financial condition is presently such that *35 it will not be able to pay the obligations to Sellers under the contract for the purchase of the stock of Gulf Industries, Inc., a Texas corporation, as provided for in an original contract dated July 23, 1958, and two supplements thereto. It seems obvious that the required additional funds are going to have to be made available to it from shareholders - and, in all likelihood, unless such funds are made available almost immediately the Employment Agreement will have to be put in default by the deferment of compensation provided for therien and the utilization of its cash to pay trade and bank creditors. The obligation of Messrs. Waggoner, Goree, Lee and Roberts to advance or cause to be advanced to Gulf a sum or sums sufficient to put it in a position to be able to discharge certain of its obligations and continue to operate has either matured or will mature quite shortly. This obligation has not been, to our knowledge, heretofore assumed by Hycon Manufacturing Company, but, of course, Hycon Manufacturing Company is subject to it as a condition of the Merger and Consent to Merger. This letter is intended as primarily informational to you, and to remined you in writing of the situation *36 in order that you may have the maximum time to take such action as you may deem to be required, and is without waiver of any rights of Messrs. Coliz and Pezzullo or Gulf Industries, Inc., and without waiver of any existing defaults and shall not operate to extend any time limits provided for by any of the various agreements to which the addressees may be parties, or to otherwise alter or affect said existing rights. No legal action was taken by Coliz and Pezzullo against either Gulf-Delaware 2 or the Roberts Group during October and November of 1959 because of their desire to avoid entangling litigation and because of assurances from Roberts that another sale could be made of the company which would enable them to receive payment in accordance with the terms of their original contract. However, in January of 1960 Gulf-Delaware 2 failed to make the minimum payments to Coliz and Pezzullo required by the terms of the Original Stock Purchase Agreement. On January 15, 1960, Coliz and Pezzullo advised Hycon Manufacturing Manufacturing Company, Roberts, Waggoner, Goree, Lee, and Witts by letter that defaults existed which arose out of the Original Stock Purchase Agreement and the Employment *37 Agreement. Hycon and the Roberts Group were further advised that failure on their part to promptly make payments as provided in the aforesaid agreements would require Coliz and Pezzullo to take whatever steps might be necessary to foreclose on the stock of Gulf-Delaware 2 then held in escrow by the First National Bank in Dallas pursuant to the Second Collateral Pledge Agreement. On February 17, 1960, Hycon Manufacturing Company, Roberts, Goree, Lee and Waggoner were given 10 days written notice, in accordance with the terms of the Second Collateral Pledge Agreement, that their stock in Gulf-Delaware 2 would be sold. On February 22, 1960, Coliz and Pezzullo entered into an agreement with Missile Systems Corporation, a Delaware corporation having its principal place of business in North Hollywood, California, and hereinafter called Missile. This agreement was subject to the condition that Coliz and Pezzullo would acquire, prior to the closing date designated therein, all of the outstanding stock of Gulf-Delaware 2 at a foreclosure sale held pursuant to the terms of the Second Collateral Pledge Agreement. The agreement provided that, on the closing date therein designated, Coliz and *38 Pezzullo would transfer to Missile, (a) all of the stock of Gulf-Delaware 2 acquired in the foreclosure sale and (b) their contractual rights to receive the balance of the purchase price of their stock in Gulf-Texas as said rights were created, amended, and existing under the Original Stock Purchase Agreement, the First Supplemental Agreement, the Employment Agreement, the First Collateral Pledge Agreement, the Second Supplemental Agreement, an agreement dated December 31, 1958, by and between Coliz and Pezzullo, Hycon Manufacturing Company, Aerial, and the Roberts Group providing for a merger of Gulf-Delaware 1 into Aerial and the continuation of Gulf-Delaware 1's business affairs; the agreement of merger dated January 27, 1959, between Gulf-Delaware 1 and Aerial, and the Second Collateral Pledge Agreement. The agreement further provided that Missile would, in consideration of the above transfer, pay to Coliz and Pezzullo: 1. $25,000 in cash on the closing date designated therein; 2. $75,000 in principal amount of Missile's 6 percent promissory notes, payable $25,000 90 days after the designated closing date, $25,000 180 days after the designated closing date, and $25,000 270 *39 days after the designated closing date; 3. $265,000 in shares of the common stock of Missile, based on the price of such stock on the Friday immediately preceding the closing date, as designated in the agreement. On or about February 29, 1960, all of the stock of Gulf-Delaware 2 was sold at foreclosure to Coliz and Pezzullo for $1,000 pursuant to the Second Collateral Pledge Agreement. On March 26, 1960, Missile acquired from Coliz and Pezzullo all of the stock of Gulf-Delaware 2 in accordance with the terms of the February 22, 1960 purchase agreement. Thereafter, Missile operated Gulf-Delaware 2 as a wholly owned subsidiary, and, on August 1, 1960, the name of Gulf-Delaware 2 was changed to Missile Systems Corporation of Texas. The books and records of Gulf-Texas disclose that no dividends were paid or declared from the date of its incorporation through October 31, 1955, nor, according to the Federal income tax returns of that corporation did it declare any dividends from November 1, 1955, through August 18, 1958. [6] The books and records of Gulf-Delaware 1 likewise disclose that no dividends were paid by that corporation from the date of its incorporation through March 1960. *40 On their respective Federal income tax returns for the year 1958 petitioners reported the gain on the sale of their stock in Gulf-Texas as a long term capital gain. In his notice of deficiency respondent treated the amounts so reported by petitioners as a dividend, stating: It is determined that the $174,000.00 reported by you as proceeds from the sale of a capital asset in the year 1958 represents a distribution of earnings and profits from a corporation taxable to you as ordinary income. Opinion Simply stated, the issue is whether the transfer by petitioners of their stock in Gulf-Texas to Gulf-Delaware 1 during the month of August 1958 constituted a bona fide sale. Respondent maintains that it did not. In support of his position he argues three alternatives. First, respondent contends the entire transaction between petitioners, the Roberts Group, and Gulf-Delaware 1 was a sham and should be disregarded as lacking in bona fides. In this connection he argues that there was no *41 arm's length dealing between petitioners and Gulf-Delaware 1, that Gulf-Delaware 1 had no assets with which to make the $348,000 down payment to petitioners thus rendering the sale invalid for lack of consideration, that Gulf-Delaware 1 immediately entered into an alleged sale and lease-back arrangement which had no substance and which amounted to nothing more than a device to raise cash for the purpose of making a dividend distribution to petitioners, and that, overall, there was no business purpose for the transaction. Respondent's second argument is that the $174,000 received by each of petitioners represented dividend distributions of Gulf-Delaware 1 rather than proceeds from the sale of a capital asset. That is so he maintains because petitioners were the actual promoters of Gulf-Delaware 1 and because they retained complete control over that corporation. He argues that instead of receiving the contractual promise of Gulf-Delaware 1 to pay the balance of the purchase price (i.e., the Original Stock Purchase Agreement), what petitioners actually received was a document called a "Debenture," [7] but which in fact was the equivalent of stock, issued solely to enable them to withdraw *42 the earnings and profits of Gulf-Delaware 1 in the guise of capital gains. His third argument is that the individual petitioners, pursuant to an agreed-upon plan within the meaning of section 354(a)(1), [8] exchanged their Gulf-Texas stock for the equivalent of stock (i.e., the "Debenture") in Gulf-Delaware 1 and cash, in the course of a reorganization within the purview of section 368(a)(1)(A)[9] and therefore that the cash received by them represented a distribution *43 of earnings and profits taxable as dividend pursuant to section 356(a)(1) and (2). [10]
*44 Although cast in the alternative, respondent's arguments all rest upon a single premise, viz., that there was no sale of petitioners' Gulf-Texas stock. Each argument represents, therefore, merely a different approach to taxing the amounts received by petitioners at ordinary rates assuming there was no sale. Cf. Estate of Ernest G. Howes, 30 T.C. 909, 920-921 (1958). Whether or not the transaction before us was in substance a bona fide sale of petitioners' Gulf-Texas stock is a question of fact. While we might marshall and discuss at length the substantial evidence presented on both sides of this question, it is our view that such an effort would be without purpose. Extended discussions of factual materials, pro and con, terminating in a conclusion that is based in the last analysis upon a subjective judgment about the weight of the various materials considered, often gives merely the illusion of a process of reasoning, when in fact the result reached is simply the trial court's ultimate finding on the record as a whole. We have carefully considered the entire record, and although in that plethora of conflicting documents and testimony there is much which would lead *45 us, like Shakespeare's Prince, to speculate upon the course of affairs in the State of Denmark, we find the preponderance of credible evidence to be in petitioners' favor. Accordingly, it is our decision that petitioners in fact made a sale of their Gulf-Texas stock and that the amounts received by each of them during the year 1958 consequent upon such sale represent proceeds from the sale of a capital asset. Decisions will be entered in both dockets for petitioners. Footnotes
1. Missile Systems Corporation of Texas, Docket No. 94827, originally also consolidated with these proceedings, has now been severed by motion of the parties.↩
2. As used in this opinion the term "petitioners" refers only to Waldemar J. Coliz and John Pezzullo, and not to the wives of either of them unless so stated.↩
3. The letter referred to is addressed to "Chance Vought Aircraft, Incorporated, P.O. Box 5907, Dallas, Texas," and is signed by Coliz and Pezzullo on behalf of Gulf-Texas and C. P. Waggoner on behalf of Gulf-Delaware 1. It provides in pertinent part as follows: This letter will confirm that, in part consideration for the transfer of the assets of Gulf Industries, Inc. (a Texas corporation) to Gulf Industries, Inc. (a Delaware corporation) pursuant to the provisions of the agreement of merger between the two companies executed on July 23, 1958, Gulf Industries, Inc. (a Delaware corporation) hereby recognizes and assumes the obligation of Two Hundred Twenty-eight Thousand, Three Hundred Dollars ($228,300.00), which amount is due and owing by Gulf Industries, Inc., (a Texas corporation) to Chance Vought Aircraft, Incorporated, as the balance on May 26, 1958 of the monetary refund to be made by them to Chance Vought Aircraft, Incorporated arising out of a voluntary reduction in the prices of articles purchased by Chance Vought Aircraft, Incorporated from Gulf Industries, Inc. (a Texas corporation) under certain purchase orders for the performance of certain of its prime contracts with the United States Government. It is hereby agreed and understood that the aforementioned obligation will be satisfied by Gulf Industries, Inc. (a Delaware corporation) in the following manner. Chance Vought Aircraft, Incorporated shall withhold 5% of the amounts due under all invoices rendered to them by Gulf Industries, Inc., (a Delaware corporation) under purchase orders assigned to them by Gulf Industries, Inc. (a Texas corporation) and under purchase orders which may be issued in the future by Chance Vought Aircraft, Incorporated, to Gulf Industries, Inc. (a Delaware corporation). Chance Vought Aircraft, Incorporated shall apply said withheld amounts in partial satisfaction of the aforementioned obligation until the entire amount of said obligation is satisfied. * * * Notwithstanding any other provision in this agreement, in the event the total amount of the invoices (prior to withholding) rendered by Gulf Industries, Inc. (a Delaware corporation) to Chance Vought Aircraft, Incorporated should equal to or exceed the sum of $2,000,000.00 and the aforementioned obligation has not been fully satisfied, the entire unpaid balance of such obligation shall become due and payable upon demand of Chance Vought Aircraft, Incorporated. Also, notwithstanding any other provision of this agreement, in the event Gulf Industries, Inc. (a Delaware corporation) should become insolvent or enter bankruptcy, voluntarily or involuntarily, or in the event the net assets of the company (exclusive of goodwill) should decrease 50% or more in appraised fair market value as compared with the appraised fair market value of the net assets (exclusive of goodwill) on June 30, 1958 (it being the intent that appraised fair market values shall be used in determining net worth as opposed to book values determined by deducting the depreciation used for tax purposes), or in the event 50% or more of the assets of the company are sold or otherwise disposed of (provided this clause shall refer only to sale or disposition of assets without replacing the same and shall not be taken to refer to sale or disposition of assets which are replaced), the entire unpaid balance of the obligation shall become due and payable on demand of Chance Vought Aircraft, Incorporated.↩
4. The Roberts Group, none of whom knew anything about the machine parts business, wanted such an agreement to insure that Coliz and Pezzullo would remain at Gulf and run the business.↩
5. We note, however, that while the Original Stock Purchase Agreement was signed by Waggoner, Goree, Lee as "Buyers," the introductory recital of that agreement provides: This contract and agreement, made this 23 day of July, 1958, between John Pezzullo and W. J. Coliz, hereinafter referred to as Sellers, and C. P. Waggoner, Eugene W. Goree, Sam W. Lee, * * * being stockholders, and acting for and in behalf of a corporation organized under the laws of the State of Delaware, and known as Gulf Industries, Inc., hereinafter referred to as Buyers * * *.↩
6. However, for the years 1957 and 1958 certain amounts treated by Gulf-Texas as officers' salaries were disallowed as deductions by agents of the respondent and treated instead as dividends.↩
7. At the trial of this case respondent introduced into evidence a Thermo-Fax copy of an undated and unsigned document entitled "Gulf Industries, Inc., Debenture." Petitioners denied ever receiving such a document. David Witts who was secretary to Gulf-Delaware 1, as well as its counsel and the attorney who prepared the majority of the documents relative to the sale of petitioners' Gulf-Texas stock, testified that to his knowledge no such document was ever issued by Gulf-Delaware 1. While there is some evidence which would tend to establish the existence of this purported "Debenture," it is our view that the preponderance of the evidence clearly refutes the existence of such a document as a legally effective instrument.↩
8. SEC. 354. EXCHANGE OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS. (a) General Rule. - (1) In General. - No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. ↩
9. SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS. (a) Reorganization. - (1) In General. - For purposes of parts I and II and this part, the term "reorganization" means - (A) a statutory merger or consolidation: ↩
10. SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION. (a) Gain on Exchanges. - (1) Recognition of Gain. - If - (A) section 354 or 355 would apply to an exchange but for the fact that (B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property. (2) Treatment as Dividend. - If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.↩